**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| SOLINA MAO, JAMES BARCLAY, SAMANTHA HARVEY, ANAHI ESTRADA, MARY ROLON, MELISSA CROXFORD, KAYCI STADDON, MONICA MAY, SOMMER FOLEY, KIMBERLY CHOURIO, PRESTON PARKER, SANDRA SCHILTZ, NAZARI CHAPPOTIN, LILIANA MORENO, BELETZA VAZQUEZ, AND SKYLAR HARRIS *individually and on behalf of all similarly situated individuals*, | Civil Action No. 4:21-cv-65 |
| Plaintiffs, | |
| v. | |
| GLOBAL TRUST MANAGERS, LLC; GLOBAL TRUST MANAGEMENT, LLC; RTC INVESTORS, LLC; REEL TIME CAPITAL, LLC; BRADLY SPOOR; PARAMOUNT ASSETS PROTECTION SERVICES, LLC D/B/A PARAMOUNT PROCESSING GROUP, LLC; JEFFREY PUSATERI; DIRECT RECOVERY SERVICES, LLC; NATIONWIDE CAPITAL SERVICES, LLC, D/B/A STRUCTURED SETTLEMENT; and JOHN DOES 1-15, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

The Plaintiffs, Solina Mao, James Barclay, Samantha Harvey, Anahi Estrada, Mary Rolon, Melissa Croxford, Kayci Staddon, Monica May, Sommer Foley, Kimberly Chourio, Preston Parker, Sandra Schiltz, Nazari Chappotin, Liliana Moreno, Beletza Vazquez, and Skylar Harris (collectively "Plaintiffs"), individually and on behalf of all similarly situated individuals, by

counsel, file this Amended Class Action Complaint against Defendants Global Trust Managers, LLC; Global Trust Management, LLC; RTC Investors, LLC; Reel Time Capital, LLC; Bradley Spoor; Paramount Assets Protection Services, LLC d/b/a Paramount Processing Group, LLC; Jeffrey Pusateri; Direct Recovery Services, LLC; Nationwide Capital Services, LLC, d/b/a Structured Settlement; and John Does 1-15 (collectively "Defendants"). In support of their Complaint, Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiffs and the putative class members were victimized by American Web Loans ("AWL") "payday" loans, which are short-term credit products sold with extremely high interest rates and targeted at low-income, high-risk individuals. AWL's payday loans were sold over the internet and were described as immediate "fast cash." Although these high-interest loans are illegal under most states' usury laws, several schemes have developed in order to evade these lending restrictions.

2.     One of the most common schemes is the "tribal-lending model," in which a payday lender recruits a Native American tribe to ostensibly establish a business entity to function as the nominal, originating lender of the payday loans, primarily operating over the internet. "In truth, the setup is a scheme to hide behind tribal immunity and commit illegal usury in violation of" state usury laws. *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).

3.     AWL was one of those tribal-lending schemes. It was purportedly operated by a Native American tribe, but for all practical purposes, Mark Curry and his companies (none of whom are part of a Native American tribe) controlled the loans and received the vast majority of the profits that the loans generated.

4.      Plaintiffs and the putative class members are AWL borrowers. While the Plaintiffs' claims were resolved against AWL, Curry, MacFarlane Group, and Sol Partners in *Solomon v. American Web Loan Inc.,* No. 4:17-cv-0145-HCM-RJK (E.D. Va.), the lending scheme did not end there. Instead, due to the triple-digit interest on these predatory loans, thousands of AWL borrowers defaulted on their loans. AWL sold these defaulted accounts to several third-party collection companies.

5.      Defendant Bradley Spoor, acting through his network of companies, Global Trust Managers, Global Trust Management, RTC Investors, and Reel Time Capital (the "Debt Buyer Defendants"), has purchased close to $100 million in defaulted AWL debt for pennies on the dollar. *See* Hr'g Tr. at 4:15–17, *Solomon v. American Web Loan Inc.,* No. No. 4:17-cv-0145-HCM-RJK (E.D. Va. Apr. 7, 2021), ECF No. 487 (noting AWL loans appear to be have been sold to debt buyers for $0.10 on the dollar). Mr. Spoor and his companies are one of the remaining debt purchasers that are actively trying to collect the usurious and illegal AWL debts.

6.      Upon information and belief, the Debt Buyer Defendants contracted with other "down-stream" debt collectors, such as Defendants Direct Recovery, Paramount, and Structured Settlement, in order to coerce consumers into paying money on these loans that they do not owe. In turn, Defendants Direct Recovery, Paramount and its owner Defendant Pusateri, and Structured Settlement use strong-arm tactics such as calling family members and employers, lying about pending court action, and threatening "forceful garnishment" and "orders of location" in an effort to extort desperate consumers into repaying these illegal loans.

7.      Accordingly, Plaintiffs bring this action for: injunctive relief; actual, statutory, trebled, and punitive damages; and costs and attorney's fees for Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; the Fair

Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p; unjust enrichment; fraud; and state consumer protection and usury statutes. Plaintiffs also seek a declaratory judgment that the AWL loans are invalid and uncollectable.

## JURISDICTION AND VENUE

8.      The Court has original jurisdiction over Plaintiffs' RICO (*see* 18 U.S.C. § 1964) and FDCPA (*see* 15 U.S.C. §1692) claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Plaintiff Mao resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Venue is also proper in this Court under 18 U.S.C. § 1965 because Defendants have transacted their affairs in Virginia, including, upon information and belief, the collection of millions of dollars in this District and the transmission of countless communications in an attempt to collect debts in Virginia.

## PARTIES

10.      Plaintiff Mao is a natural person, resident of Virginia, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). He is also a person under RICO. 18 U.S.C. § 1961(3).

11.      Plaintiff Barclay is a natural person, resident of Iowa, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). He is also a person under RICO. 18 U.S.C. § 1961(3).

12.      Plaintiff Harvey is a natural person, resident of California, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

13.     Plaintiff Estrada is a natural person, resident of Arizona, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

14.     Plaintiff Rolon is a natural person, resident of Florida, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

15.     Plaintiff Croxford is a natural person, resident of Indiana, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

16.     Plaintiff Staddon is a natural person, resident of Arizona, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

17.     Plaintiff May is a natural person, resident of Arizona, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

18.     Plaintiff Foley is a natural person, resident of Nebraska, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

19.     Plaintiff Chourio is a natural person, resident of Texas, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

20.     Plaintiff Parker is a natural person, resident of Louisiana, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

21.     Plaintiff Schiltz is a natural person, resident of Wisconsin, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

22.     Plaintiff Chappotin is a natural person, resident of Arizona, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

23.     Plaintiff Moreno is a natural person, resident of Florida, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

24.     Plaintiff Vazquez is a natural person, resident of California, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

25.     Plaintiff Harris is a natural person, resident of Florida, and "consumer" as defined and governed by the FDCPA. 15 U.S.C. § 1692a(3). She is also a person under RICO. 18 U.S.C. § 1961(3).

26.     Defendant Global Trust Managers is a foreign entity with its principal place of business in Florida. It transacts business throughout the United States. Global Trust is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

27.     Defendant Global Trust Management is a foreign entity with its principal place of business in Florida. It is wholly owned by Global Trust Managers and transacts business

throughout the United States. Global Trust Management is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

28.     Defendant RTC Investors is a foreign entity with its principal place of business in Florida. It transacts business throughout the United States.  RTC Investors is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

29.     Defendant Reel Time Capital is a foreign entity with its principal place of business in Florida. It is wholly owned by RTC Investors and it transacts business throughout the United States.  Reel Time Capital is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

30.     Bradly Spoor is a resident of Florida and the owner of Global Trust Managers and RTC Investors. He is also the manager of Global Trust Management and Reel Time Capital. He is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

31.     Spoor is personally responsible for the claims set forth below because he is a corporate officer of RTC Investors, Reel Time Capital, Global Trust Managers, and Global Trust Management and personally conducted each company's affairs in an illegal and criminal manner. *See Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 651 (W.D. Va. 2011).

32.     Defendant Paramount is a foreign entity with its principal place of business in South Carolina. It transacts business throughout the United States. Paramount is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

33.     Defendant Pusateri is a resident of North Carolina and the sole owner of Paramount. He resides at 7800 Montane Run Court, Waxhaw, NC 28173. He is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

34.     Pusateri can be held personally responsible for the claims set forth below because he is a corporate officer of Paramount and personally conducted each company's affairs in an

illegal and criminal manner. *See Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 651 (W.D. Va. 2011).

35.    Defendant Direct Recovery is a foreign entity with its principal place of business in Minnesota. It transacts business throughout the United States. Direct Recovery is a "debt collector" as defined by the FDCPA. 15 U.S.C. § 1692a(6).

36.    Defendant Structured Settlement is a foreign entity with its principal place of business in Nevada. It transacts business throughout the United States. Structured Settlement is a "debt collector" as defined by FDCPA. 15 U.S.C. § 1692a(6).

37.    Defendants John Doe Nos. 1-15 are unidentified parties who participated in the enterprise with the Defendants, including but not limited to entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## FACTS

### *Mr. Spoor and His Companies*

38.    Mr. Spoor owns RTC Investors and Global Trust Managers.

39.    In turn, RTC Investors is the parent company and 100-percent owner of Reel Time Capital, and Global Trust Managers is the parent company and 100-percent owner of Global Trust Management.

40.    Mr. Spoor is also a manager of both Reel Time Capital and Global Trust Management.

41.    The single and principal business purpose of each of Debt Buyer Defendants is the collection of debts, and each of the Debt Buyer Defendants is a debt collector as that term is defined at 15 U.S.C. §1692a(6). Each uses various instrumentalities of interstate commerce and the mails in the business for which the principal purpose is the collection of any debts.

42.     Upon information and belief, Mr. Spoor uses his network of companies to evade legal responsibility for any potential debt collection abuses committed towards consumers.

43.     Upon information and belief, Mr. Spoor has reaped substantial monetary gains from RTC Investors', Reel Time Capital's, Global Trust Managers', and Global Trust Management's collection efforts.

44.     The Debt Buyer Defendants accomplish their debt-buying operation by purchasing multi-million-dollar portfolios, including the AWL debt portfolio containing the Plaintiffs' and putative class members' loans.

45.     The Debt Buyer Defendants use their convoluted corporate structure to conceal critical information from consumers, including who owns their debt and who is attempting to collect that debt from them.

46.     Although the Defendants have attempted to conceal their individual roles in their debt buying enterprise from consumers, discovery will reveal additional information about the actions that each of the Debt Buyer Defendants took with respect to each of the Plaintiffs and the putative class members.

### *Plaintiffs' AWL Loans Are Usurious*

47.     Each of the Plaintiffs applied for their AWL loan through AWL's website on their home computer or other personal device in the state where they reside for a personal or household purpose.

48.     The AWL website purported to be operated by a company owned by an Oklahoma-based Native American tribe, the Otoe-Missouria. However, this website was actually established and operated by Mark Curry who, using various companies that he owned or controlled, was engaged in a tribal-lending scheme.

9

49.     Under this scheme, while AWL served as the nominal lender, Curry-owned or -affiliated entities conducted all of AWL's substantive operations including, among other things, marketing and lead generation, application processing, underwriting, technical support, electronic funds transfers, loan servicing, and collections.  Moreover, Curry, his companies, and investors that Curry recruited provided funding for the loans.  In exchange for enacting tribal-lending laws and creating the business entities necessary to enable and carry out this scheme, Curry's payday lending operation would provide the cooperating tribe with a small percentage of the revenues generated by AWL loans.

50.     This tribal-lending model was designed to avoid banking regulatory issues and leverage AWL's existing sourcing, underwriting, and servicing platforms from a previous rent-a-bank model that was shut down by the Federal Deposit Insurance Corporation.

51.     A central feature of AWL's business model is the choice-of-law and arbitration provisions used in the AWL loan agreements. The non-tribal participants in the scheme, such as the Defendants, will claim that they have no liability for their violations of state and federal laws because only tribal law applies to the loans. These claims have been uniformly denied by courts from a variety of jurisdictions—at the District and Circuit level—across the country, including by this Court with respect to loan agreements similar to those at issue here.[1]

_____

[1] *See Gibbs v. Stinson*, No. 3:18-cv-676, 2019 WL 4752792, at *14–18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Fin.*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019). *Cf. Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *Cooper v. W. Sky Fin., LLC*, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris*

52.     Each of the Plaintiffs were approved for their AWL loan almost instantaneously, based on the automated underwriting mechanisms utilized by Curry and his companies. Under the terms of these loans, AWL charged triple digit interest rates, with some loans reaching as high 700% APR.

53.     The loans offered to each Plaintiff were illegal.

54.     In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute.

55.     Almost all other state jurisdictions consider unlicensed small loans, like the AWL loan, illegal. *See, e.g.,* Alabama (Ala. Code § 5-18-4); Alaska (Alaska Stat. § 06.20.310); Arizona (Ariz. Rev. Stat. § 6-613(B)); Arkansas (Ark. Code §§ 4-57-104, 105); California (Cal. Fin. Code §§ 22303, 22750); Colorado (Colo. Rev. Stat. § 5-2-201); Connecticut (Conn. Gen. Stat. § 36a-573; District of Columbia (D.C. Code §§ 26-905, 28-3303); Florida (Fla. Stat. § 516.02); Georgia (Ga. Code § 7-3-50); Hawaii (Haw. Rev. Stat. § 478-4); Idaho (Idaho Code § 28-46-402); Illinois (815 Ill. Comp. Stat. 122/4-10); Indiana (Ind. Code § 24-4.5-5-202); Iowa (Iowa Code § 536.13); Kansas (Kan. Stat. § 16a-5-201); Kentucky (Ky. Rev. Stat. § 286.4-991); Louisiana (La. Stat. § 9:3552); Maine (Me. Rev. Stat. tit. 9-A, § 2-201); Maryland (Md. Code, Com. Law § 12-314); Massachusetts (Mass. Gen. Laws ch. 140, § 119); Michigan (Mich. Comp. Laws §§ 438.32, 445.1854); Minnesota (Minn. Stat. §§ 56.19, 334.02); Mississippi (Miss. Code. § 75-67-119); Missouri (Mo. Stat. § 408.020); Montana (Mont. Code § 31-1-108); Nebraska (Neb. Rev. Stat. § 45-1038); New Hampshire (N.H. Rev. Stat. § 399-A:23); New Jersey (N.J. Stat. §§ 31:1-

_____

*Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs., Inc.*, 811 F.3d 666 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, No. 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

1, 17:11C-32, 33); New Mexico (N.M. Stat. § 58-15-3); New York (N.Y. Gen. Oblig. Law §§ 5-501, 511, 513); North Carolina (N.C. Gen. Stat. §§ 24-2, 53-166); North Dakota (N.D. Cent. Code § 13-04.1-09.2); Ohio (Ohio Rev. Code § 1321.02); Oklahoma (14A Okla. Stat. §§ 3-201); Oregon (Or. Rev. Stat. § 725.045); Pennsylvania (41 P.S. §§ 501-502); Rhode Island (6 R.I. Gen. Laws § 6-26-4); South Carolina (S.C. Code § 34-29-140); South Dakota (S.D. Cod. Laws § 54-4-44); Tennessee (Tenn. Code §§ 47-14-110, 117); Texas (Tx. Fin. §§ 302.001-004); Vermont (Vt. Stat. tit. 9, § 50); Virginia (Va. Code § 6.2-303); Washington (Wash. Rev. Code § 19.52.020); West Virginia (W. Va. Code §§ 46A-5-101); Wisconsin (Wis. Stat. § 138.14); and Wyoming (Wyo. Stat. § 40-14-521).

56.     Usury and licensing laws are vital public policy tools that state legislatures use to protect consumers in their states from the predatory conduct of high-APR small-loan lenders. The short-term, high-interest loans that usury laws regulate are targeted at the most economically vulnerable.[2] The CFPB has recognized that these products create cycles of high-cost borrowing over extended periods of time, where consumers must take out additional payday loans to cover the costs of the prior loans at risk of punitive fees and are so caught in a "debt trap."[3] States use many policy tools to limit the proliferation of such loans. The most common tools, and the ones pertinent to this lawsuit, include limits on the maximum interest rates that can be charged and licensing requirements on charging higher rates of interest.

***Mr. Spoor and His Companies Knew that the AWL Loans They Purchased Were Usurious***

---

[2] *See* Mikella Hurley & Julius Adebayo, *Credit Scoring in the Era of Big Data*, 18 Yale J. L. & Tech. 148, 174 (2016) (on the use of "alternative" credit-scores and lead generation for payday loan vendors targeted at poor and minority communities).

[3] *See* Consumer Financial Protection Bureau, White Paper: Payday Loans and Deposit Advance Products, at 43-44 (Apr. 24, 2013).

57.     The Debt Buyer Defendants purchased tens of millions of dollars in AWL debt for pennies on the dollar.

58.     When they purchased this portfolio, the Debt Buyer Defendants knew the interest rate for each loan in the portfolio.

59.     In fact, the Debt Buyer Defendants have continued to charge interest on the loans since they purchased them.

60.     In addition, the Debt Buyer Defendants knew that each of the loans in the portfolio was an AWL loan.

61.     Prior to the Debt Buyer Defendants' purchase of the AWL debts, AWL had faced regulatory enforcement action in multiple states for its usurious lending practices. It is generally known that:

- Several states, including Connecticut, New York, Washington, and Arkansas, have taken various regulatory actions against AWL and Curry.

- In October 2014, the Second Circuit of Appeals, affirmed a district court's denial of a request by various Native American tribes—including specifically the tribe used by Curry in this scheme—to enjoin a state lending regulator's cease and desist order directed at various tribal lending enterprises, ***including AWL***. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 114 (2d Cir. 2014) (noting that "a tribe has no legitimate interest in selling an opportunity to evade state law').

- There were highly publicized governmental enforcement actions against a similar "rent-a-tribe" enterprise that the same tribe, the Otoe-Missouria, was engaged in with a different, nontribal, payday lender. *See Commonwealth of Pennsylvania v. Think Fin., Inc.,* No. 14-CV-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); *Consumer Fin. Prot. Bureau v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, (D. Mont. Aug. 3, 2018).

- There has been a RICO class action against AWL and Curry pending since 2017, which has resulted in the cancellation of all AWL outstanding loans and a cash payment of $85 million. *See Solomon v. Am. Web Loan*, No. 4:17CV145, 2019 WL 1320790 (E.D. Va.).

62.     By virtue of the loans interest rates and these prior regulatory enforcement efforts and private lawsuits, the Debt Buyer Defendants knew or should have known that these loans charged a usurious interest rate.

63.     The Debt Buyer Defendants were on further notice because they have been sued as it relates to other illegal tribal loans, which were cancelled as part of a nationwide class settlement before Judge Lauck. *Gibbs v. Plain Green, LLC*, 3:17-cv-495 (E.D. Va.) (ECF No. 141.) Despite this, the Debt Buyer Defendants attempted to collect these debts from consumers and were admonished by another federal court for this conduct. Among other things, that court explained: "As ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition.  That is what we have here, plain and simple." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).

64.     Despite this, the Debt Buyer Defendants nonetheless purchased the AWL debts, have received payments from the AWL debts, and continue to attempt to collect the AWL debts from consumers. And knowing the walls are closing in are their illegal practices, the Debt Buyer Defendants have begun aggressively attempting to collect these illegal debts, including by calling family members and employers, lying about pending court action, and threatening "forceful garnishment" and "orders of location" in an effort to extort desperate consumers into repaying these illegal loans.

### *Mr. Spoor and His Companies Use Down-Stream Collectors to Abuse Consumers*

65.     After purchasing the Plaintiffs' and putative class members' loans in the AWL portfolio, the Debt Buyer Defendants contracted with other down-stream collectors, including Defendants Paramount and Pusateri, Direct Recovery, and Structured Settlements (collectively referred to as the "Down-Stream Collector Defendants"), to collect these debts from consumers.

66.    Upon information and belief, the Debt Buyer Defendants entered into these contracts so that these loans could be collected using aggressive collection tactics while insulating the Debt Buyer Defendants from any potential FDCPA liability.

67.    Upon information and belief, the Debt Buyer Defendants knew that the Down-Stream Collector Defendants would use aggressive collection tactics, including calling third parties, threatening impermissible arrests and garnishments, and other abusive debt collection tactics in attempting to collect the AWL debts from consumers.

68.    In the alternative, the Debt Buyer Defendants should have known that the Down-Stream Collectors would have engaged in these abusive debt collection tactics in collecting and attempting to collect the AWL debts from consumers.

69.    For example and without limitation, there have been over 180 complaints filed against Direct Recovery with the Consumer Financial Protection Bureau for abusive debt collection tactics such as threatening to contact someone or share information improperly, using obscene, profane, and other abusive language, and talking to third parties about a debt.[4]

70.    Similarly, the Better Business Bureau's website lists seven complaints against Structured Settlements and four complaints against Paramount for conduct including discussing debts with employers, threatening consumers with jail time and arrests, and calling family members about debts.[5]

---

[4] https://www.consumerfinance.gov/data-research/consumer-complaints/search/?date_received_max=2021-07-20&date_received_min=2018-07-20&page=1&searchField=all&searchText=%22direct%20recovery%20services%22&size=25&sort=created_date_desc&tab=List (last visited July 20, 2021)

[5] https://www.bbb.org/us/nv/henderson/profile/collections-agencies/structured-settlement-1086-90064931/customer-reviews and https://www.bbb.org/us/ca/agoura-hills/profile/collections-agencies/paramount-processing-group-llc-1216-1278405/complaints (last visited July 20, 2021)

71.     Upon information and belief, the Down-Stream Collector Defendants also knew or should have known that the AWL debts were usurious. For example and without limitation, they were aware of the interest rates on the loans and knew or should have known about the usurious nature of the AWL loans for the reasons discussed above.

### The Defendants Formed an Enterprise to Collect the Unlawful Debt

72.     As detailed above, Defendants have joined one or more association-in-fact enterprises for the purpose of collecting unlawful debts.

73.     Defendants and others have worked together to purchase these illegal debts for pennies on the dollar and to collect on the loans in violation of federal law and state usury and licensing requirements.

74.     Each of the Defendants and others agreed to establish the illegal collection enterprise in order to collect significant profits from the usurious AWL loans.

75.     Upon information and belief, Defendants created an array of different companies involved to facilitate the illegal collection, conceal the roles of the individuals involved, and distribute the profits from the illegal loans to the individuals involved in the illegal collection enterprise.

76.     Without Defendants' participation in the enterprise, Plaintiffs' loans would never have been collected on.

77.     At all times relevant to the Complaint, each of the Defendants understood the usurious nature of their illegal collection enterprise and furthered the enterprise by continuing to extort payments on usurious loans from Plaintiffs.  Defendants understood that the loans that they were attempting to collect from consumers were illegal, and that their efforts, as well as the efforts of the other members of the association-in-fact enterprise, violated state and federal law.

78.     Defendants knew of and agreed to the overall objective of the illegal collection enterprise and conspiracy to collect unlawful debt. Defendants participated in the enterprise by attempting to collect, and in fact collecting, illegal debts from Plaintiffs and the putative class members.

### *Defendants Attempt to Collect Usurious Debts from Plaintiffs*

79.     Each of the Plaintiffs defaulted on their AWL debt, and their loans were subsequently sold to Mr. Spoor and his companies for pennies on the dollar.

80.     The Debt Buyer Defendants have collected or attempted to collect these debts from each of the Plaintiffs, both by engaging in direct collection efforts themselves and through the actions of the Down-Stream Collector Defendants.

81.     Regarding Plaintiff Mao, the Debt Buyer Defendants acquired his AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Direct Recovery Services.

82.     On or around January 19, 2021, Direct Recovery Services sent Plaintiff Mao an email in an attempt to collect the AWL debt from him.

83.     This email falsely stated that Plaintiff Mao owed $2,534.63 for his AWL loan.

84.     Regarding Plaintiff Barclay, Debt Buyer Defendants acquired his AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants.

85.     Global Trust Management called Plaintiff Barclay and attempted to collect the outstanding AWL debt from him.

86.     On or around February 19, 2020, Structured Settlements sent Plaintiff Barclay a letter falsely stating that he owed an outstanding balance on his AWL debt.

87.    Then, starting in or around December 2020, Plaintiff Barclay started receiving calls from Defendant Paramount.

88.    Plaintiff Barclay received approximately six calls from Paramount.

89.    During these calls, Defendant Paramount, acting at the direction of Defendant Pusateri, threatened Plaintiff Barclay with "forced collection" of the AWL debt, including garnishment of his wages.

90.    Defendant Paramount could not legally garnish Plaintiff Barclay's wages because it did not have a judgment against him.

91.    Defendant Paramount also falsely told Plaintiff Barclay that it was legally able to collect the debt because it operated under Tribal law and that federal law did not apply to the loans.

92.    Defendant Paramount also told Plaintiff Barclay that he was breaking the law by refusing to pay the AWL loan and that he was committing "intent to defraud a financial institution."

93.    Then, on April 19, 2021, Defendant Paramount sent Plaintiff Barclay a letter stating that it had "validated" his AWL debt and falsely stating that he owed $2,979.28 on the loan.

94.    Distraught by the Defendants' collection efforts and worried that it would render him unable to financially support his three children, Plaintiff Barclay entered into a payment plan with Defendant Paramount.

95.    Plaintiff Barclay paid $79.28 to Defendant Paramount.

96.    Regarding Plaintiff Harvey, the Debt Buyer Defendants acquired her AWL loan.

97.    One or more of the Defendants called Plaintiff Harvey in an attempt to collect the debt. Plaintiff Harvey is unsure of the identity of the callers because they would not identify themselves to her.

98.     On or around April 22, 2021, Global Trust Management sent Plaintiff Harvey an email falsely stating that she owed $2,862.10 on her AWL loan.

99.     Regarding Plaintiff Estrada, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

100.    On or around April 23, 2021, Defendant Paramount sent Plaintiff Estrada an email, which stated:

> **Dear Debtor,**
>
> Alright, Get ready with your attorney to fight the case against the company because we are going to download your case file and you are going to be legally prosecuted in the Court House within a couple of days.
>
> So don't ignore our notification and kindly pay back your debt and close this case file ASAP.
>
> **We would like to tell you if Once this case is downloaded then you have to bear a lawsuit amount of $4206.00.**
>
> **Do revert ASAP.**

101.    Afraid of facing legal action, Plaintiff Estrada paid Defendant Paramount $551.20 that same day.

102.    Defendant Paramount, acting at the direction of Defendant Pusateri, also called Plaintiff Estrada several times in an attempt to collect the AWL loan from her.

103.    During these calls, Defendant Paramount threatened to garnish Plaintiff Estrada's wages if she did not pay the debt.

104.    Defendant Paramount could not legally garnish Plaintiff Estrada's wages because it did not have a judgment against her.

19

105.    Plaintiff Estrada informed Defendant Paramount that she did not believe that the AWL loan was legal and that she was a class member in the AWL settlement, but Defendant Paramount falsely represented that she still owed a balance on the AWL loan.

106.    Defendant Paramount also called Plaintiff Estrada's mother and sister and left them voicemails regarding Plaintiff Estrada's debt.

107.    Regarding Plaintiff Rolon, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

108.    Global Trust Management sent Plaintiff Rolon an email falsely stating that she owed $2,618.86 on her AWL loan.

109.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Rolon several times in an attempt to collect the AWL loan from her.

110.    During these calls, Defendant Paramount told Plaintiff Rolon that they were going to file a criminal action against her regarding the debt, threatened to call her job, and told her that they were going to come to her house.

111.    Defendant Paramount also called Plaintiff Rolon's family members, including her mother, brother, sister, and husband regarding the AWL loan.

112.    Defendant Paramount told Plaintiff Rolon's family members that there was going to be a warrant for Plaintiff Rolon's arrest because of the AWL loan.

113.    Regarding Plaintiff Croxford, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

114.    On or around February 18, 2020, Global Trust Management sent Plaintiff Croxford an email falsely stating that she owed more than $800 on her AWL loan.

115.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Croxford several times in an attempt to collect the AWL loan from her.

116.    During these calls, Defendant Paramount told Plaintiff Croxford that they were going to file two civil suits against her and that she would have to appear in court the next day unless she immediately paid them $388.

117.    Defendant Paramount also told Plaintiff Croxford that they would garnish her wages if she did not make a payment.

118.    Defendant Paramount could not legally garnish Plaintiff Croxford's wages because it did not have a judgment against her.

119.    Relying on these conversations, Plaintiff Croxford made two payments totaling $415 to Defendant Paramount.

120.    Defendant Paramount also called Plaintiff Croxford's family members, including her parents, aunt, and brother regarding the AWL loan.

121.    Defendant Paramount told Plaintiff Croxford's family members that they had filed two civil complaints against Plaintiff Croxford regarding the AWL loan.

122.    Regarding Plaintiff Staddon, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

123.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Staddon several times in an attempt to collect the AWL loan from her.

21

124.    During these calls, Defendant Paramount told Plaintiff Staddon that she owed over $4,000 for her AWL loan, even though her original loan was for approximately $700.

125.    Defendant Paramount also pretended that they had Plaintiff Staddon's bank card information and told her that they had tried to process a payment on the card and that it had been declined, so she would need to make restitution within 24 hours.

126.    Defendant Paramount also told Plaintiff Staddon that she was being sued for two different types of fraud and that they were serving her over the phone unless she paid the debt.

127.    Regarding Plaintiff May, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

128.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff May several times in an attempt to collect the AWL loan from her.

129.    During these calls, Defendant Paramount told Plaintiff May that she owed $800 for an AWL loan that she took out in June 2019.

130.    Plaintiff May did not remember taking out an AWL loan in June 2019, so she asked for documentation regarding the loan, but Defendant Paramount refused to provide it.

131.    Defendant Paramount told Plaintiff May that they would engage in "forced" recovery if she didn't set up payment arrangements the same day.

132.    In reliance on Defendant Paramount's representations, Plaintiff May paid $99 to Defendant Paramount.

133.    Regarding Plaintiff Foley, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

134.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Foley several times in an attempt to collect the AWL loan from her.

135.    During these calls, Defendant Paramount told Plaintiff Foley that the police would show up at her job and arrest her if she did not set up a payment plan with them.

136.    In reliance on these representations, Plaintiff Foley paid Defendant Paramount $250.36.

137.    Defendant Paramount also called Plaintiff Foley's family members, including her sister and ex-partner regarding the AWL loan.

138.    Defendant Paramount told Plaintiff Foley's family members that they would be filing legal action against Plaintiff Foley for the AWL loan.

139.    Regarding Plaintiff Chourio, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants.

140.    Global Trust Management sent Plaintiff Chourio an email stating that she owed an outstanding balance on her AWL loan.

141.    Plaintiff Chourio also started receiving collection calls regarding the AWL loan. Plaintiff Chourio believes that these calls were made by one or more of the Down-Stream Collector Defendants, but the callers refused to identify themselves.

142.    During these calls, the callers told Plaintiff Chourio that she owed approximately $6,000 for a $1,400 loan, even though she had paid $700 towards the loan before she defaulted on it.

143.    They also threatened Plaintiff Chourio and told her that they would place a lien against her home for the debt.

144.    Relying on these representations, Plaintiff Chourio paid $1,738.48 to one or more of the Defendants.

145.    Regarding Plaintiff Parker, the Debt Buyer Defendants acquired his AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants.

146.    On or around June 2 2021, Global Trust sent Plaintiff Parker an email in an attempt to collect the AWL debt from him.

147.    This email falsely stated that Plaintiff Parker owed $4,014.33 for his AWL loan.

148.    Defendant Global Trust also placed numerous calls to Plaintiff Parker attempting to collect a payment from him.

149.    Regarding Plaintiff Schiltz, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

150.    Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Schiltz several times in an attempt to collect the AWL loan from her.

151.    During these calls, Defendant Paramount told Plaintiff Schiltz that they were going initiate legal action against her if she did not make a payment.

152.    Relying on these conversations, Plaintiff Schiltz paid $241.27 to Defendant Paramount.

153.    Defendant Paramount also called Plaintiff Schiltz's family members, including her husband and children regarding the AWL loan.

154.    Regarding Plaintiff Chappotin, the Debt Buyer Defendants acquired his AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

155.     Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Chappotin several times in an attempt to collect the AWL loan from him.

156.     During these calls, Defendant Paramount told Plaintiff Chappotin that they were going initiate legal action against him that would cost him so much that it would double his principal balance if he did not make a payment.

157.     Defendant Paramount also called Plaintiff Chappotin's family members, including mom and sister regarding the AWL loan.

158.     Regarding Plaintiff Moreno, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Structured Settlement.

159.     Global Trust Management sent Plaintiff Moreno a letter dated January 20, 2021 stating that she owed $2,231.59 for the AWL loan.

160.     Defendant Structured Settlement called Plaintiff Moreno over 100 times in an attempt to collect the AWL loan from her.

161.     During these calls, Defendant Structured Settlement told Plaintiff Moreno that it would initiate legal action against her if she did not set up a payment plan.

162.     In reliance on these false statements Plaintiff Moreno paid $1,054.16 to Defendant Structured Settlement.

163.     Regarding Plaintiff Vazquez, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Paramount.

164.     Defendant Paramount, acting at the direction of Defendant Pusateri, called Plaintiff Vazquez several times in an attempt to collect the AWL loan from her.

165.     During these calls, Defendant Paramount told Plaintiff Vazquez that she owed an outstanding balance on the AWL loan and convinced her to set up a payment plan.

166.     Relying on these conversations, Plaintiff Vazquez paid $1,332.08 to Defendant Paramount.

167.     Regarding Plaintiff Harris, the Debt Buyer Defendants acquired her AWL loan and subsequently placed it for collection with one or more of the Down-Stream Collector Defendants, including Defendant Structured Settlement.

168.     Defendant Structured Settlement, called Plaintiff Harris several times in an attempt to collect the AWL loan from her.

169.     During these calls, Defendant Structured Settlement falsely told Plaintiff Harris that she owed several thousand dollars for her defaulted AWL loan.

170.     In reliance on Defendant Structured Settlement's representations, Plaintiff Harris entered into a payment plan to resolve the debt and paid $2,199.35 to Defendant Structured Settlement.

171.     In or around February 2021, Plaintiff Harris cancelled her payment plan with Defendant Structured Settlement.

172.     After she canceled her payment plan, Defendant Structured Settlement sent Plaintiff Harris an email on or around February 22, 2021 falsely stating that she still owed $2,465.66 on her defaulted AWL loan.

173.     To be clear, all of the Defendants' communications with Plaintiff and the putative class members were false and misleading because their AWL loans were usurious under the laws of their home states.

26

174.     Therefore, it was illegal for any person to collect or attempt to collect any interest and, in some instances, principal, on the usurious AWL loans.

175.     Therefore, each Defendants' representations that the AWL debt were outstanding or had a balance were materially false.

## CAUSES OF ACTION

### COUNT ONE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692e
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

176.     Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

177.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class (the "FDCPA § 1692e Class") initially defined as:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) who were the subject of collection or attempted collection by any of the Defendants.

> Plaintiffs Mao, Barclay, Staddon, Harvey, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris and Vazquez are members of this class.

178.     Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris and Vazquez also bring this action on behalf of the following subclass (the "FDCPA § 1692e Actual Damages Sub-Class"):

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; (3) who were the subject of collection or attempted collection by any of the Defendants; and (4) who made any payments on the AWL loans to any of the Defendants.

> Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris and Vazquez are members of this class.

179.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Class members are

spread across the United States. Their names and addresses are identifiable through the Defendants' internal business records, and they may be notified of this litigation by published or mailed notice.

180.   **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants are debt collectors; (2) whether Defendants violated § 1692e of the FDCPA by attempting to collect debts that were unlawful; and (3) the appropriate amount of statutory damages.

181.   **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

182.   **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

183.   **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

184.    Defendants violated § 1692e by using unfair and deceptive practices to collect on the invalid or unenforceable debts, including by: indicating to Plaintiffs that they owed amounts that they did not owe, and deceptively labeling the debts as though they were legal, valid, and enforceable when they were not.

185.    To the extent that the Debt Buyer Defendants did not take this collection action themselves, they are vicariously liable for the collection activity of the Down-Stream Collector Defendants.

186.    Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, Vazquez, and the putative FDCPA § 1692e Actual Damages Sub-Class Members also suffered actual damages in the form of payments made as a result of Defendants' violations of § 1692e.

187.    Based on Defendants' violations of § 1692e, Plaintiffs seek statutory damages, reasonable attorneys' fees, and costs for each putative FDCPA § 1692e Class member under 15

U.S.C. § 1692k. They also seek actual damages for the putative FDCPA § 1692e Actual Damages Sub-Class Members.

**COUNT TWO:**
**VIOLATION OF FDCPA, 15 U.S.C. § 1692f**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

188.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

189.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "FDCPA § 1692f Class"—initially defined as:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) who were the subject of collection or attempted collection by any of the Defendants.

> Plaintiffs Mao, Barclay, Staddon, Harvey, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris, and Vazquez are members of this class.

190.    Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, and Vazquez also bring this action on behalf of the following subclass (the "FDCPA § 1692f Actual Damages Sub-Class"):

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; (3) who were the subject of collection or attempted collection by any of the Defendants; and (4) who made any payments on the AWL loans to any of the Defendants.

> Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, and Vazquez are members of this class.

191.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Class members are spread across the United States. Their names and addresses are identifiable through the Defendants' internal business records, and they may be notified of the pendency of this action by published or mailed notice.

30

192.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all putative class members, and there are no factual
or legal issues that differ between the putative class members. These questions predominate over
the questions affecting only individual class members. The common questions include: (1) whether
Defendants are debt collectors; (2) whether Defendants violated § 1692f of the FDCPA by
attempting to collect debts that were not permitted by law; and (3) the appropriate amount of
damages.

193.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of
each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of
action as the other putative class members. All claims are based on the same facts and legal
theories.

194.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate
representatives of the putative class because their interests coincide with, and are not antagonistic
to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel
competent and experienced in class-action litigation, and they intend to continue to prosecute the
action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the
class members. Neither Plaintiffs nor their counsel have any interests that might cause them to not
vigorously pursue this action.

195.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the
class members predominate over questions affecting only individual members, and a class action
is superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome
and expensive. It would be virtually impossible for the class members to effectively redress the

wrongs done to them in individual cases. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

196.    Defendants violated § 1692f by attempting to and collecting amounts from Plaintiffs and class members that were not "permitted by law." The illegal loans are, by definition, not amounts that are due to be paid through a valid, legal agreement. Instead, the debts were void or unenforceable under state law or federal law.

197.    Defendants also violated this section by threatening to take legal action such as "forceful garnishments," "location orders," and wage garnishments when there was not court case pending and they had no intent to file a court case.

198.    To the extent that the Debt Buyer Defendants did not take this collection action themselves, they are vicariously liable for the collection activity of the Down-Stream Collector Defendants.

199.    Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, Vazquez, and the putative FDCPA § 1692f Actual Damages Sub-Class Members also suffered actual damages in the form of payments made as a result of Defendants' violations of § 1692f.

200.    Based on Defendants' violations of § 1692f, Plaintiffs seek statutory damages, reasonable attorneys' fees, and costs for each putative FDCPA § 1692f Class member under 15

U.S.C. § 1692k. They also seek actual damages for the putative FDCPA § 1692f Actual Damages

Sub-Class Members.

## COUNT THREE:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692c
### (PLAINTIFFS ESTRADA'S, ROLON'S, CROXFORD'S, FOLEY'S, SCHILTZ'S, AND CHAPPOTIN'S INDIVIDUAL CLAIM AGAINST DEFENDANTS GLOBAL TRUST MANAGERS, GLOBAL TRUST MANAGEMENT, RTC INVESTORS, REEL TIME CAPITAL, SPOOR, PARAMOUNT, AND PUSATERI)

201.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

202.    Defendants violated § 1692c by contacting third parties about Plaintiff Estrada's,

Rolon's, Croxford's, Foley's, Schiltz's, and Chappotin's AWL loans and discussing the details of

the debts with them, as detailed above.

203.    To the extent that the Debt Buyer Defendants did not make these telephone calls

themselves, they are vicariously liable for the calls made by Paramount and Pusateri.

204.    Plaintiffs Estrada, Rolon, Croxford, Foley, Schiltz, and Chappotin suffered actual

damages as a result of Defendants' violations of § 1692c including, but not limited to, invasion of

privacy, embarrassment, stress, and other emotional distress.

205.    Based on Defendants' violations of § 1692c, Plaintiffs Estrada, Rolon, Croxford,

Foley, Schiltz, and Chappotin seek their actual damages, statutory damages, reasonable attorneys'

fees, and costs under 15 U.S.C. § 1692k.

## COUNT FOUR:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

206.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding

paragraphs.

207.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action

for themselves and on behalf of a class (the "RICO § 1962(c) Class") initially defined as:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) who were the subject of collection or attempted collection by any of the Defendants.

> Plaintiffs Mao, Barclay, Staddon, Harvey, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris, and Vazquez are members of this class.

208.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members are geographically disbursed throughout the United States. Their names and addresses are identifiable through the Defendants' internal business records, and they may be notified of the pendency of this action by published or mailed notice

209.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants are members of the enterprise that collects unlawful debts; (2) whether Defendants participated in the management or affairs of the enterprise and, thus, are liable for the collection of the illegal loans; (3) whether the loans were illegal under Virginia's, Arizona's, California's, Florida's, Indiana's, Iowa's, Nebraska's, Texas's, Louisiana's, and Wisconsin's and other states' usury statutes; (4) the appropriate amount of damages; (5) the nature of Defendants' violations; and (6) and the extent that Defendants' violations were intentional.

210.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

211.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the class members. Neither Plaintiffs nor their counsel have any interest that might cause them to not vigorously pursue this action.

212.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual cases. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

213.    All of the loans made to consumers throughout the United States (except those in Utah and Nevada) included an interest rate far in excess of twice the enforceable rate in the consumers' respective state.

214.     As alleged above, each of the Defendants associated with an enterprise that existed for the purpose of collection of unlawful debt, agreed that the enterprise would engage in the collection of unlawful debt, and participated in the affairs of the enterprise.

215.     Each of the Defendants were directly and materially involved in this intentional misconduct and knew or should have known the subject loans were illegal under state law, but they pursued the scheme anyway.

216.     Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs to repay amounts on unlawful loans.

217.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

## COUNT FIVE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

218.     Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

219.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class (the "RICO § 1962(d) Class") initially defined as:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) who were the subject of collection or attempted collection by any of the Defendants.

> Plaintiffs Mao, Barclay, Staddon, Harvey, Mao, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris, and Vazquez are members of this class.

220.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The class members are geographically disbursed throughout the United States. Their names and addresses are

36

identifiable through the Defendants' internal business records, and they may be notified of the pendency of this action by published or mailed notice.

221.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants are members of the enterprise that collected unlawful debts; (2) whether Defendants conspired with others to violate RICO; (3) whether the loans were illegal under Virginia's, Arizona's, California's, Florida's, Indiana's, Iowa's, Nebraska's, Texas's, Louisiana's, and Wisconsin's, and other states' usury statutes; (4) the appropriate amount of damages; (5) the nature of Defendants' violations; and (6) the extent that Defendants' violations were intentional.

222.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

223.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the putative class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

224.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual cases. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

225.   As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to conspire to violate § 1962(c), including but not limited to: (1) the agreement to purchase the usurious AWL loans; and (2) agreements related to the collection of payments regarding the AWL loans.

226.   Defendants conspired and agreed to advance a RICO undertaking and caused Plaintiffs to repay amounts on unlawful loans.

227.   Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

**COUNT SIX:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAISNT ALL DEFENDANTS)**

228.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

229.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) who made any payments to the Defendants.

> Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, and Vazquez are members of this class.

230.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. The putative class members are disbursed throughout the country, making joinder impracticable. Additionally, the class members' names and addresses are identifiable through the Defendants' internal business records, and the class members may be notified of the pendency of this action by published or mailed notice.

231.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loans on which they collected payments were illegal; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

232.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of

action as the other putative class members. All claims are based on the same facts and legal theories.

233. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4)**. Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class-action litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

234. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members effectively redress the wrongs done to them in individual cases. Even if the class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

235. All of the loans included in the class definition are void and unenforceable where they were made in violation of state usury and/or licensing laws.

236.     Plaintiffs conferred a benefit on Defendants when they repaid the loans that were illegal because they had no obligation to do so and, therefore, Defendants were owed nothing; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans such that it would be inequitable for Defendants to retain the money they received.

237.     Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on the loan.

**COUNT SEVEN:**
**VIOLATIONS OF LICENSING AND USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

238.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

239.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class (the "Usury Injunctive Relief Class") initially defined as follows:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; and (3) that loan was subsequently purchased by any of the Defendants.

> Plaintiffs Mao, Barclay, Staddon, Harvey, Mao, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris, and Vazquez are members of this class.

240.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a sub-class (the "Usury Damages Sub-Class") initially defined as follows:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; (3) that loan was subsequently purchased by any of the Defendants and (4) the consumer repaid any amount that was void or usurious under their respective state's law.

Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, and Vazquez are members of this class.

241.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published or mailed notice.

242.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

243.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

244.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the AWL loans violate state licensing requirements; (2) whether the AWL loans violate state usury laws because the interest levels were too high; and (3) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

245. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

246. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making injunctive relief with respect to the Plaintiffs and class members appropriate. The Plaintiffs and the putative class seek an injunction declaring the loans void and ordering Defendants to cease collection on the usurious loans.

247. Virginia, Arizona, Iowa, Nebraska, Wisconsin, Florida, California, and many other states require all who engage in the business of making personal loans to be licensed.

248. None of the Defendants were licensed to make loans in Virginia, Arizona, Iowa, Nebraska, Wisconsin, Florida, California, or any other state in the United States.

249. Because Defendants failed to obtain a license and charged excessive interest rates, the loans are null and void or voidable in Virginia, Iowa, California, Arizona, and many other

states. Accordingly, Plaintiffs and class members may disgorge the amounts received by Defendants. *See, e.g.*, Va. Code § 6.2-1541; Cal. Fin. Code §§ 22303, 22750; Ariz. Rev. Stat. § 6-613(B); Iowa Code § 536.13.

250.    In addition to licensing violations, Defendants' loans violated the general usury laws of many states including Virginia, Arizona, Iowa, Indiana, Nebraska, Texas, Wisconsin, Florida, and California. *See* Va. Code § 6.2-303; Ariz. Rev. Stat. § 6-613(B); Iowa Code § 536.13; Ind. Code § 24-4.5-5-202; Neb. Rev. Stat. § 45-1038; Tx. Fin. §§ 302.001-004; Wisconsin (Wis. Stat. § 138.14); Fla. Stat. § 516.02; Cal. Fin. Code §§ 22303, 22750.

251.    As a result, Plaintiffs and the Usury Injunctive Relief Class are entitled to an injunction declaring the loans void and prohibiting them from collecting any amounts from the usurious loans.

252.    In addition, Defendants received payments from Plaintiffs Barclay, Estrada, Croxford, Chourio, Schiltz, Moreno, May, Foley, Harris, and Vazquez and the Usury Damages Sub-Class members. Therefore, those Plaintiffs and class members are entitled to recover the applicable damages allowed by those state statutes.

**COUNT EIGHT:**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

253.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

254.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class (the "Declaratory Judgment Class") initially defined as follows:

> All consumers: (1) located in any state other than Utah or Nevada; (2) who took out a loan with AWL; (3) that loan was subsequently purchased by any of the Defendants; and (4) who have any outstanding balance on their loan.

Plaintiffs Mao, Barclay, Staddon, Harvey, Mao, Estrada, Rolon, Croxford, May, Foley, Chourio, Parker, Schiltz, Chappotin, Moreno, Harris, and Vazquez are members of this class.

255. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published or mailed notice.

256. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

257. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

258. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the AWL loans are valid; and (2) whether the AWL loans are collectable.

259. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

260.    **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making injunctive relief with respect to the Plaintiffs and class members appropriate. The Plaintiffs and the putative class seek an injunction declaring the loans void and ordering Defendants to cease collection on the usurious loans.

261.    Virginia, Arizona, Iowa, Nebraska, Wisconsin, Florida, California, and many other states require all who engage in the business of making personal loans to be licensed.

262.    None of the Defendants were licensed to make loans in Virginia, Arizona, Iowa, Nebraska, Wisconsin, Florida, California, or any other state in the United States.

263.    Because Defendants failed to obtain a license and charged excessive interest rates, the loans are null and void or voidable in Virginia, Iowa, California, Arizona, and many other states. Accordingly, Plaintiffs and class members may disgorge the amounts received by

Defendants. *See, e.g.*, Va. Code § 6.2-1541; Cal. Fin. Code §§ 22303, 22750; Ariz. Rev. Stat. § 6-613(B); Iowa Code § 536.13.

264.     In addition to licensing violations, Defendants' loans violated the general usury laws of many states including Virginia, Arizona, Iowa, Indiana, Nebraska, Texas, Wisconsin, Florida, and California. *See* Va. Code § 6.2-303; Ariz. Rev. Stat. § 6-613(B); Iowa Code § 536.13; Ind. Code § 24-4.5-5-202; Neb. Rev. Stat. § 45-1038; Tx. Fin. §§ 302.001-004; Wisconsin (Wis. Stat. § 138.14); Fla. Stat. § 516.02; Cal. Fin. Code §§ 22303, 22750.

265.     Additionally, the loan agreements were violative of fundamental state public policy in Virginia and other states with similar usury, licensing, and criminal laws.

266.     Plaintiffs and the putative class members are subject to ongoing harm absent a declaration that the loans are void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

267.     The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the AWL loans, as well as the validity, if any, of the choice-of-law and the forum-selection provisions.

268.     Under 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

269.     Accordingly, the Plaintiffs seek a declaratory judgment that the loan agreements are invalid and the loans are uncollectable.

**COUNT NINE:**
**VIOLATIONS OF UNFAIR COMPETITION LAW (CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

270.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

271.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Vazquez brings this action for herself and on behalf of a class—the "Restitution Class"—initially defined as follows:

> **Restitution Class**: All individuals: (1) located in California; (2) who took out an AWL loan; (3) that loan was subsequently purchased by any of the Defendants; and (4) the consumer paid any amount of principal, interest, fees, or other charges.

Plaintiff Vazquez is a member of the Restitution class.

272.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff Vazquez alleges that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published or mailed notice.

273.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the AWL loans made to California consumers violated California law because their interest rates were too high; (2) whether the Defendants' conduct was unlawful, unfair, or deceptive under California's unfair competition law; (3) whether Plaintiffs may recover from

48

Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against each Defendant.

274.   **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiff Vazquez's claims are typical of the claims of each putative class member. In addition, Plaintiff Vazquez is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

275.   **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiff Vazquez is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent. Plaintiff Vazquez has retained counsel competent and experienced in such litigation, and she intends to continue to prosecute the action vigorously. Plaintiff Vazquez and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Vazquez nor her counsel have any interests that might cause them to not vigorously pursue this action.

276.   **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

277.    Defendants have engaged in business acts and practices that constitute unfair competition in violation of Business and Professions Code section 17200. Specifically, Defendants engaged in unlawful, unfair, and deceptive business practices likely to deceive the general public through their debt collection practices, which seek to collect on high-interest loans to consumers throughout the country, including California, in violation of, *inter alia*, 18 U.S.C. § 1962(a)-(d) and California usury laws.

278.    Defendants engaged in these unfair practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et. seq.* of the California Business and Professions Code.

279.    The aforementioned acts and practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

280.    As a result of Defendants' unfair, fraudulent, and unlawful business practices alleged herein, Plaintiffs and putative class members have been injured in amounts not less than any interest, fees, or other sums that Defendants have collected, the amounts of which have not yet been ascertained, but which are believed to exceed millions of dollars in the aggregate. These amounts have been paid to Defendants by Plaintiff Vazquez and members of the putative class and should be restored to them. Plaintiff Vazquez thus seeks, on behalf of those similarly situated, full restitution of such sums acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

50

281.    Unless and until enjoined and restrained by order of this Court, Defendants will continue to engage in their unlawful, unfair, and fraudulent practices described above in violation of the laws of California, unless specifically ordered to comply with the same, thereby engendering further injury and expanding the number of injured members of the public beyond its already large size, which will tend to render any judgment at law, by itself, ineffectual. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Under such circumstances, Plaintiff Vazquez and members of the putative class have no adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Plaintiff Vazquez thus seeks, on behalf of those similarly situated, and are entitled to both a declaration that Defendants' above-described trade practices are unfair, unlawful, and/or fraudulent, and injunctive relief restraining Defendants from engaging in any of such deceptive, unfair, and/or unlawful trade practices in the future.

### COUNT TEN:
### FRAUD
### (INDIVIDUAL CLAIMS AGAINST ALL DEFENDANTS)

282.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

283.    All of the Plaintiffs' loans are void or unenforceable where they were made in violation of state usury or licensing laws.

284.    As detailed above, Defendants knew that the loans were void and unenforceable.

285.    Despite knowing this information, Defendants worked together to falsely indicate to the Plaintiffs that each of them was liable for the debts by both telephone calls and written correspondence, as detailed above.

286.    Each statement to the Plaintiffs that they owed money on their AWL loans, as detailed above, was materially false.

287.    Defendants made these false statements regarding the AWL loans in order to mislead the Plaintiffs about the validity and status of the debts.

288.    Each Plaintiff relied on these false statements.

289.    For example, Plaintiffs Barclay, Croxford, Estrada, Chourio, Schiltz, Moreno, May, Foley and Vazquez made payments on the AWL loans.

290.    The Plaintiffs each suffered damages as a result of the Defendants' fraud, including paying money that the did not owe and emotional distress, including stress, anxiety and embarrassment.

291.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, actual damages, punitive damages, attorney's fees, and costs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the classes they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Actual, punitive, and statutory damages as pleaded herein;

C.    Injunctive relief as pleaded herein;

D.    Attorneys' fees, litigation expenses, and costs of suit; and

E.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**PLAINTIFFS,**

By:____ */s/ Kristi C. Kelly*_____
Kristi C. Kelly, VSB #72791

Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

Irv Ackelsberg, (Pro Hac Vice Pending)
John J. Grogan, (Pro Hac Vice Pending)
David A. Nagdeman, (Pro Hac Vice Pending)
**LANGER, GROGAN & DIVER, PC**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660
Facsimile: (215) 320-5703
Email: iackelsberg@langergrogan.com

Jason E. Causey, (Pro Hac Vice Pending)
**BORDAS & BORDAS, PLLC**
1358 National Road
Wheeling, WV 26003
Telephone: (304) 242-8410
Facsimile: (304) 284-4142
Email: jcausey@bordaslaw.com
*Counsel for Plaintiffs*